# RUTH IRON COMPANY ET AL., PETITIONERS, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.[1]

Docket No. 7224. Decided September 28, 1926.

In January, 1913, petitioners sold certain ore-bearing property and each of them received in exchange for its or his interest therein a cer-

---

[1] The following proceedings were heard with the above and are decided herewith: Eva Iron Company, Docket No. 7128; Reading Investment Co., Docket No. 7220; Francis S. Kosmerl, Docket No. 8875; Merchants Trust Co., Executor, Estate of Cordenio A. Severance, Docket No. 12710.

tain amount in cash and forty-one non-interest-bearing promissory notes, payable annually thereafter, endorsed by the United States Steel Corporation and further secured by a vendor's lien upon the property. *Held*, that the amounts received by petitioners upon the payment of their respective notes in the years 1919, 1920, 1921, and 1922, in excess of the fair market value of such notes on March 1, 1913, which value was in excess of cost, was taxable income.

*Guy Chase, Esq.*, and *Francis W. Sullivan, Esq.*, for the petitioners.
*John W. Fisher, Esq.*, for the respondent.

Petitioners question the determination of deficiencies as follows:

| Petitioner. | 1919. | 1920. | 1921. | 1922. |
|---|---|---|---|---|
| Ruth Iron Co | $99.47 | $135.49 | $169.79 | |
| Eva Iron Co | 23.90 | 50.83 | 76.48 | |
| Reading Investment Co | | 230.07 | 274.05 | |
| Francis S. Kosmerl | | | 1,440.58 | $1,405.51 |
| Estate of C. A. Severance | | | 828.93 | |

Upon motion the proceedings were consolidated and heard together, since they all involve the same question, to wit, whether any taxable income was received upon the payment in the years for which the deficiencies have been determined of non-interest-bearing notes received by petitioners on January 1, 1913, as part of the consideration for property sold by them on that date.

### FINDINGS OF FACT.

For many years prior to 1913 petitioners were owners of certain undivided interests in an iron-ore-bearing property known as the Kosmerl Mine in St. Louis County, Minn. In 1903 they leased the property to the Oliver Iron Mining Co. for a term of fifty-one years, ending in 1954, at a royalty of 35 cents a ton of ore mined, and certain minimum annual royalties. All minimum royalties had been paid to and including December 31, 1912.

On January 1, 1913, all of the fee owners joined in a sale of the property to the Oliver Iron Mining Co., lessee, at the price specified in subdivision 12 of the contract of sale as follows:

The purchase price of said lands shall be determined by multiplying the number of tons of iron ore found to exist on said lands on the foregoing basis, by thirty-five (35) cents for each ton; from such product there shall be deducted the sum of $530,000 heretofore paid in royalties under the aforesaid lease by the Purchaser to the Vendors; the remainder shall be divided into forty-one (41) equal annual payments considered as payable one forty-first each year, commencing with January 1st, 1913, such payments to be evidenced by the promissory notes of said Oliver Iron Mining Company, dated January 1st, 1913, without interest, the payment of which shall be guaranteed

by the United States Steel Corporation, which guarantee the Purchaser agrees to procure. Each of the following Vendors shall be entitled to separate notes, payable to his or its order for his or its interest in said property, said interests of said Vendors being as follows:

Francis S. Kosmerl, an undivided 441/1080,
Frank B. Kellogg, an undivided 7/90,
Cordenio A. Severance, an undivided 7/90,
Ruth Iron Company, an undivided 107/960,
Reading Investment Co. an undivided 823/5760,
Eva Iron Company, an undivided 1/12,
The Gregory Company, an undivided 63/640.

Subdivision 13 of said contract reads as follows:

The Vendors shall at all times have a first lien upon the lands for the full amount remaining unpaid upon said notes from time to time, such lien of the Vendors to be secured by a first mortgage thereon, executed by the Purchaser to the Vendors, satisfactory to the Vendors, but in any case permitting the mining and shipping away of iron, ore, equal in value, at thirty-five (35) cents per ton to the amount of all said purchase money notes theretofore paid.

While any of said notes remain unpaid no ore shall be mined from said premises exceeding in value at thirty-five (35) cents per ton, the amount that shall theretofore have been paid on said notes. The Purchaser shall keep a record of the number of tons of ore mined and shipped from said lands, and at the end of each calendar year in which shipments are made, shall furnish the Vendors a duly verified statement of the number of tons shipped during the year.

The sale was effective on January 1, 1913, and the deed, the mortgage and notes bear that date.

The deed declared that "A lien is hereby reserved by said parties of the first part [vendors] to secure the unpaid balance of the purchase price of said lands."

The mortgage provided as follows:

* * * That if the said Mortgagor, its successors or assigns, shall well and truly pay or cause to be paid to the holders of the notes or obligations hereinafter described, or to their respective heirs, executors, administrators or assigns, the sum of three million, eight hundred and nineteen thousand, five hundred twelve dollars and twenty cents ($3,819,512.20) in gold coin or its equivalent and interest, if any, according to the conditions of four hundred (400) promissory notes, all bearing even date herewith, all made by the Mortgagor, then this deed to be null and void; otherwise to be and remain in full force and effect; * * *

This mortgage is given to secure the unpaid portion of the purchase price of said mortgaged premises, the lien for which is referred to and reserved in a deed given therefor by Francis S. Kosmerl, Frank B. Kellogg and wife, Cordenio A. Severance and wife, Ruth Iron Company, Eva Iron Company, Reading Investment Company and The Gregory Company to the said Oliver Iron Mining Company dated January 1st, 1913, and upon the discharge of this mortgage the said lien referred to in said deed shall thereby, without any other act or thing done, be and become satisfied and discharged.

50144°—27——76

Notwithstanding anything herein contained to the contrary, the Mortgagor and the Trustees, have agreed to, and this mortgage is made and accepted upon the conditions following, to-wit; The Mortgagor may mine and remove from said lands at any time a quantity of iron ore equal in value at the rate of thirty-five cents (35 cents) per ton to the sum of six hundred twenty-five thousand, four hundred eighty-seven dollars and eighty cents ($625,487.80) heretofore paid by the Mortgagor and also in addition thereto a quantity of iron ore equal in value at the rate of thirty-five cents (35 cents) per ton .to the aggregate amount of all notes given as a part of such purchase price and paid prior to the time of removal of such ore; and the Mortgagor covenants and agrees that no iron ore exceeding the total of the aforesaid quantities, which the Mortgagor may remove from time to time as aforesaid, shall be removed from said lands until the notes given for the purchase price of said lands are fully paid.

Each of the notes given were the same with the exception of the amount thereof and the name of the payee. They were signed by the Oliver Iron Mining Co. by its president and its secretary and assistant treasurer, and read as follows:

DULUTH, MINNESOTA, *January 1st, 1913.*

$_____

On or before _____ years after date the OLIVER IRON MINING COMPANY, a Minnesota Corporation, promises to pay to the order of RUTH IRON COMPANY _____ dollars in gold coin or its equivalent, at The First National Bank of Duluth, Duluth, Minnesota, without interest until after maturity. Value received.

Each note was endorsed by the United States Steel Corporation by its treasurer, as follows: " For value received the payment of the within note, according to its terms, is hereby guaranteed." Each of the vendors received separate notes for his or its proportionate part of the total purchase price less his or its proportion of the cash payment made on January 1, 1913.

The total sale price of the land was computed on 12,700,000 tons of ore at 35 cents a ton, amounting to $4,445,000, less advance and minimum royalties theretofore paid amounting to $530,000. One forty-first of the purchase price was paid in cash on January 1, 1913.

Certain of the purchase price notes given by the vendee to petitioners came due on January 1, 1919, 1920, 1921, and 1922, and the face amounts thereof without interest were in each instance promptly paid.

The Commissioner held that as the notes were paid each year the owners thereof realized taxable income to the extent of the excess of the amount of payments received over the fair market price or value of the notes on March 1, 1913. Such value was determined by him to be the present worth of the notes on that date computed at a discount of 5 per cent compound interest.

LITTLETON: Petitioners do not question the Commissioner's determination of the March 1, 1913, value of the notes in question, but they contend that no portion of the payments of the face amount of the notes in the years involved constituted taxable gain, profit or income under the Revenue Acts of 1918 and 1921, for the reason that the face amount of the notes, which in the hands of the vendors of the property represented merely evidence of deferred purchase-price payments, was capital on March 1, 1913, and that subsequent payment thereof represented entirely such March 1, 1913, capital.

When, on January 1, 1913, the petitioners herein sold their respective interests in the property known as the Kosmerl Mine for cash and notes of the Oliver Mining Co., there was an exchange of property for property, a completed transaction. Thereafter, and on March 1, 1913, all that the petitioners had of exchangeable value was the non-interest-bearing notes of the Oliver Mining Co., maturing annually over a period of 39 years, 10 months. The cost of these notes to the petitioners was the fair market value of the Kosmerl Mine, at the date of the exchange, less the total of the minimum royalties theretofore paid by the purchaser which was allowed as an offset against the purchase price and the cash payment of 1/41 of the remainder of the purchase price which was paid on January 1, 1913. The petitioners have offered no evidence to prove the fair market value of the mine at the date of the exchange. On the other hand, they contend that the cost of the notes was 12,700,000 tons of ore of the value of 35 cents per ton or the equivalent of their face value. But such is not the case. The cost of the consideration received in exchange for the mine could be no greater than the fair value, at the date of the exchange, of the mine with which they parted. This seems so obviously correct to us that its mere statement is sufficient for present purposes. Lacking evidence of the fair market value of the mine, at the date of the exchange, the logical assumption is that the petitioners received value for value. That is to say, that the value of the mine was equivalent to the value of the consideration received therefor. If the value of the mine, at the date of the exchange, is equivalent to the cost of the consideration as well as the value of the consideration, it follows as a necessary corollary that the cost of the consideration is equivalent to the value of the consideration. So, the Commissioner has determined that the cost of the notes to the petitioners was their discounted value, at 5 per cent. compound interest, at the date of exchange, a cost necessarily lower than the March 1, 1913, value of the notes, since at March 1,

1913, the discount period was two months less than at the date of the exchange.

But, contend the petitioners, the notes of the Oliver Mining Co. were capital assets at March 1, 1913, and any amount received in liquidation thereof or from the sale thereof, subsequent to that date, if not in excess of the face value of the notes, represents a mere return of capital owned on March 1, 1913. Not entirely so. We agree that the notes were capital assets at March 1, 1913, but the contention that the amounts received in liquidation thereof after that date represent a return of capital can only be true if the face value of the notes was the fair market value thereof at March 1, 1913. True, the notes evidence the right of the petitioners ultimately to receive the full amount of their face value; but the amount which the petitioners will ultimately receive does not represent their capital investment in these notes at March 1, 1913; rather this investment is represented by the fair market value of the notes at that date. This is the principle laid down in section 202(a) of the Revenue Acts of 1918 and 1921, where, in prescribing the basis for the determination of gain or loss upon an exchange of property, Congress directed that the determination be made upon the basis of the fair market value of the property at March 1, 1913, in the case of property acquired before that date. One might acquire a bond having a par value of $100 at a cost of $25 and having a fair market value, at March 1, 1913, of $50. Certainly, it can not be successfully maintained that, because the bond will entitle him to receive $100 if held to the date of maturity, he is entitled to have returned to him, free from taxation, the amount which at March 1, 1913, he was entitled to receive at some future date. Yet this is precisely the thing for which the petitioners contend.

The petitioners further contend that no part of the deferred payments of the purchase price is income within the meaning of the applicable statutes, and that that which the Commissioner treats as income from the notes is in fact a part of the deferred payments on the purchase price of the mine, a part of the capital itself. But we are not here dealing with deferred payments of the purchase price, as such. The sale of the Kosmerl Mine in 1913 for cash and notes was one transaction, and the conversion of some of those notes into cash during the years in question is another transaction. It is this latter transaction which we have under consideration and it involves simply a disposition, for cash, of notes which the petitioners owned on March 1, 1913, and which had an ascertainable value at that date. To the extent that the proceeds from the notes exceeded

the March 1, 1913 value thereof, which the Commissioner has ascertained to be greater than cost, the petitioners have realized a taxable gain upon the conversion of those notes.

*Judgment for the Commissioner.*

PHILLIPS concurs in the result only.